IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC.,<br><br>Plaintiffs,<br>v.<br><br>MEDICAL COMPONENTS, INC.,<br><br>Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO LIMIT SUBJECT MATTER JURISDICTION<br><br>Case No. 2:12-cv-00032-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is a Motion to Limit Subject Matter Jurisdiction filed by Defendant Medical Components, Inc. ("MedComp" or "Defendant"). ECF No. 870 ("Def.'s Mot."). Plaintiffs C.R. Bard, Inc. ("Bard") and Bard Peripheral Vascular ("BPV") (collectively, "Plaintiffs") oppose Defendant's motion. ECF No. 878 ("Pls.' Opp."). For the reasons set forth herein, Defendant's motion is DENIED.

## BACKGROUND

In 2012, Bard initiated this action, asserting patent infringement claims related to its power injectable port technology. At the start of the lawsuit, Bard was the assignee of the patents-in-suit and thus had standing to bring the action. In 2017, Bard assigned legal title to the patents-in-suit to BPV, Bard's wholly owned subsidiary. BPV therefore became a successor in interest and gained statutory standing under 35 U.S.C. § 281. As a result, BPV joined this lawsuit as a co-plaintiff.

In 2018, Bard entered into a Distribution Agreement with Bard Shannon, Limited ("BSL"), a nonparty. BSL oversees the manufacturing and packaging of the power injectable port technology products that are the subject of the patents-in-suit. Defendant claims the Agreement

"vested sole and exclusive ownership of the patents-in-suit in BSL," thus depriving Plaintiffs of standing to sue on all claims on or after January 1, 2018. Def.'s Mot. at 1. Plaintiffs responded that the Agreement only reaffirmed BSL's ownership over patents it already owned, which did not include the patents-in-suit relevant to this litigation. Pls.' Opp. at 2. Thus, the issue before the court is whether the Distribution Agreement transferred any rights in the patents-in-suit to BSL, consequently depriving Plaintiffs of standing in this instant action.

## I.     THE DISTRIBUTION AGREEMENT

In September 2018, Bard and BSL entered into a contract, effective January 1, 2018, in which the parties agreed that Bard would continue to serve as BSL's "non-exclusive distributor of Products in the [United States] . . . ." ECF No. 872-1 ("Distribution Agreement") at 1, 3. The Agreement identifies Bard as the "Distributor" and BSL as the "Company." *Id.*

Section 7.1 of the Agreement states, "Distributor acknowledges and agrees that, as between the Parties, Company is the sole and exclusive owner of all Intellectual Property in or related to Products and Marks and Distributor shall acquire no rights whatsoever in any such Intellectual Property or Marks." *Id.* at 8. "Products" is generally defined as "the medical, surgical, diagnostic, and patient care devices and related products and services commercially supplied to Distributor by Company. . . ." Distribution Agreement at 3. Although the Agreement does not specifically mention the power injectable port materials, Bard's 30(b)(6) witness and Chief Counsel of Intellectual Property, Scott Rittman, testified that they are covered under the term "Products." ECF No. 880-1 ("Rittman Tr.") 184:14-17.

The definition of "Intellectual Property" includes ". . . patents . . . which are owned by, licensed to or otherwise acquired by Company prior to, on or after the Effective Date . . . ." *Id.* at 2. Rittman testified that the term does not include the patents-in-suit because "they're not owned by . . . They're not licensed to, and they weren't otherwise acquired by [BSL]." Rittman Tr. 185:3-

2

16. The Agreement does not explicitly mention the patents-in-suit. But it does provide that, "except as provided herein, this Agreement does not constitute a license, sale or any other transfer of the Intellectual Property." Distribution Agreement at 8.

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction, possessing only the powers authorized by Article III of the Constitution or statutes enacted by Congress. *See Bender v. Williamsport area Sch. Dist.*, 475 U.S. 534, 541 (1986). Thus, a district court must dismiss an action "[i]f it determines at any time that it lacks subject-matter jurisdiction." FED. R. CIV. P. 12(h)(3). "Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction. . . ." *Rivera v. IRS*, 708 Fed. Appx. 508, 513 (10th Cir. 2017).

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Plaintiffs have the burden of establishing the elements of standing. *Id.* at 561. Specifically, in a patent infringement action, standing depends on whether "a party can establish that it has an exclusionary right in a patent that, if violated by another, would cause the party holding the exclusionary right to suffer legal injury." *Univ. of S. Fla. Rsch. Found., Inc. v. Fujifilmm Med. Sys. U.S.A.*, 19 F.4th 1315, 1323 (Fed. Cir. 2021).

## ANALYSIS

Defendant argues that Bard lacks standing because it transferred its exclusive right to the patents-in-suit to its subsidiary, BSL. But the parties do not dispute that Bard owned the patents when it filed this lawsuit in 2012. At the outset, Bard was the assignee of the patents-in-suit as recorded with the U.S. Patent and Trademark Office. Although the recording does not presuppose

3

the validity of the assignment, it does create "a presumption of validity . . . and places the burden to rebut such a showing on one challenging the assignment." *Sirf Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1328 (Fed. Cir. 2010). Thus, Defendant bears the burden of proving that Bard no longer owns the patents-in-suit.

Defendant points to the Distribution Agreement as evidence that Bard transferred its exclusive ownership rights to BSL. In determining whether Bard did so, the court will interpret the Agreement in accordance with state contract law. *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1370 (Fed. Cir. 2008) ("Construction of patent assignment agreements is a matter of state contract law."). And because the Agreement provides that it "shall be governed by and construed in accordance with the laws of New Jersey," the court will apply New Jersey law to contract construction. Distribution Agreement at 13.

Under New Jersey law, "it is well settled that [c]ourts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract." *Matter of Estate of Jones*, 305 A.3d 525, 533 (N.J. Super. 2023) (citations omitted). The New Jersey Supreme Court emphasized that a "disproportionate emphasis upon a word or clause or single provision does not serve the purpose of interpretation." *Boyle v. Huff*, 314 A.3d 793, 798 (N.J. 2024). Thus, "words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose [of the parties]." *Id.*

In arguing its position, Defendant directs the court to Section 7.1 of the Agreement as well as its transfer pricing arrangement. The court analyzes these two arguments below.

I. **DISTRIBUTION AGREEMENT § 7.1 INTERPRETATION**

To support its argument, Defendant emphasizes that Section 7.1 provides that "as between the parties, Company [BSL] is the sole and exclusive owner of all Intellectual Property in or related

4

to Products . . ." *See* Def.'s Mot. at 2-3 (quoting Distribution Agreement at 8). But Defendant places a "disproportionate emphasis" on Section 7.1 and ignores the definition of "Intellectual Property," the overall purpose of the Agreement, and a clause that expressly states the Agreement does not convey any patent rights. *Boyle*, 314 A.3d at 798.

First, Plaintiffs argue that the definition of "Intellectual Property," as defined by the Agreement, only applies to patents in which BSL already has an interest. The court agrees that the fact the parties included the caveat, "Intellectual Property" only includes "patents . . . which are owned by, licensed to or otherwise acquired by [BSL]," assumes that all patents relating to Products are not necessarily owned by BSL. Distribution Agreement at 2. There would be no reason for the parties to include this limitation if the Agreement in fact transferred all intellectual property to BSL as Defendant claims. Thus, even if "Products" includes power injectable port products that are the subject of the patents-in-suit, Section 7.1 does not, by itself, transfer exclusive patent rights of all patents relating to the power injectable port technology to BSL.

Second, the parties made clear that the underlying purpose of the contract was to continue the distributor-manufacturer relationship between Bard and BSL, ensuring BSL maintained its ownership rights to intellectual property it owned at the time of contract execution. *See id.* at 1. Assuming this overall purpose, it is logical that the parties would want to include language clarifying BSL's current intellectual property ownership to ensure that none would be purportedly transferred to Bard via the contract.

Finally, the Agreement clarifies that it does not "constitute a license, sale, or any other transfer of the Intellectual Property." *Id* at 8. Given this clause, the overall purpose and context of the contract, as well as the limitation included in the definition of "Intellectual Property," the most

sensical reading of Section 7.1 is that it ensures BSL maintains sole and exclusive ownership over all Intellectual Property to which it currently has such an interest.

Indeed, Rittman testified that the patents-in-suit did not qualify as "Intellectual Property" as defined in the Agreement because they were never owned, licensed to, or otherwise acquired by BSL. Rittman Tr. 185:3-16. And if the court interprets the term in this way, Defendant provides no other persuasive evidence to demonstrate the Agreement transferred rights of the patents-in-suit.

## II.  TRANSFER PRICING ARRANGEMENT

Defendant also argues that Bard's transfer pricing arrangement required transferring ownership of the applicable patents. *See* Def.'s Mot. at 9. Defendant relies on the expert report prepared by Dr. Nancy Voth to support this argument, citing Dr. Voth's opinion that BSL "owned the economic rights to the Port Intangibles." ECF No. 872-3 ("Expert Report") at 8. But owning economic rights to a patent does not necessarily mean a party has legal ownership of that patent. Indeed, Dr. Voth's own report differentiates between legal and economic ownership:

> OECD Guidelines further develops the concepts of both legal ownership and economic ownership of Intangibles as follows: While determining legal ownership and contractual arrangement is an important first step in the analysis, these determinations are separate and distinct from the question of remuneration under the arm's length principle. For transfer pricing purposes, legal ownership of intangibles, by itself, does not confer any right ultimately to retain returns derived by the MNE group from exploiting the intangible [emphasis added], even though such returns may initially accrue to the legal owner as a result of its legal or contractual right to exploit the intangible.

ECF No. 880-4 ("Voth Report") at 22. Further, Dr. Voth specifically states in her report that she has "no opinion on where the legal ownership of the Bard patents resides," and then further explains that legal ownership "is only one of several factors . . . to determine ownership of Intangibles to allocate profits [for transfer pricing arrangement purposes] . . . ." *Id.*

6

After considering the intent of the parties, the underlying purpose of the agreement, the express terms and surrounding circumstances, the court concludes that the Distribution Agreement does not transfer ownership of the patents-in-suit to BSL. Therefore, Plaintiffs retain standing to maintain this action.

## CONCLUSION AND ORDER

For the foregoing reasons, the court hereby DENIES Defendant's Motion to Limit Subject Matter Jurisdiction. ECF No. 870.

Signed December 12, 2024

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge