IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| C.R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC., <br><br>             Plaintiffs, <br><br> v. <br><br> MEDICAL COMPONENTS, INC., <br><br>             Defendant. | **MEMORANDUM DECISION AND ORDER RESOLVING CLAIM CONSTRUCTION DISPUTES AND GRANTING IN PART AND DENYING IN PART THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT** <br><br> Case No. 2:12-cv-00032-JNP-DAO <br><br> District Judge Jill N. Parrish <br><br> Magistrate Judge Daphne A. Oberg |

Plaintiffs C.R. Bard, Inc. ("C.R. Bard") and Bard Peripheral Vascular ("BPV") (collectively, "Bard" or "Plaintiffs") brought this action against Defendant Medical Components Inc. ("MedComp" or "Defendant"), asserting claims of patent infringement. Before the court are several disputes regarding the proper construction of terms found in the patents at issue as well as the parties' cross-motions for summary judgment. ECF No. 892 ("Pls.' Mot."), 896 ("Def.'s Mot."). In this order, the court GRANTS the parties' Joint Motion to Determine Markman Issues and resolves the claim construction disputes. ECF No. 909. The court also GRANTS Plaintiffs' Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

**BACKGROUND**

There are four patents at issue in this litigation. Plaintiffs assert three patents: U.S. Patent Nos. 7,785,302 ("the '302 patent), 7,947,022 ("the '022 patent"), 7,959,615 ("the '615 patent") (collectively, "Bard's patents"). ECF Nos. 69-1 ("022 Patent), 69-2 ("302 Patent"), 69-3 "615 Patent"). Defendant asserts one patent: U.S. Patent No. 8,021,324 ("the '324 patent"). ECF No.

750-1 ("324 Patent"). All the patents in this case are directed at vascular access ports that can be "implanted beneath a patient's skin to enable direct access to a central vein for delivery of medicine or other fluids." *C.R. Bard, Inc. v. AngioDynamics, Inc.,* 748 Fed. App'x. 1009, 1011 (Fed. Cir. 2018). This allows medical professionals to repeatedly and easily access the blood vessels of patients who require frequent intravenous therapy. *Id.* But unlike conventional access ports, the ports described in the patents in suit are power injectable, meaning they are designed to withstand a certain amount of pressure commensurate with power injection technology.[1]

In 2004, the Food and Drug Administration ("FDA") cautioned healthcare providers that using conventional ports with power injection technology could result in a serious patient harm as conventional ports are not designed to withstand the pressure of power injection. But because the power injectable ports are often imbedded beneath the skin of the patient, a healthcare provider cannot immediately, visually determine whether the port is rated for power injection. Thus, Bard developed a vascular access port product, the PowerPort MRI, which can be identified as safe for power injection. Two of Bard's patents, the '302 patent and the '022 patent, use a radiopaque identifier, the letters "CT," that can be seen on an x-ray. Bard's other patent, the '615 patent, uses structural features that can be identified by palpation of the port itself.

On November 6, 2006, Bard applied to the FDA to market the PowerPort MRI ("the 510(k) application"). The FDA subsequently approved Bard's 510(k) application to market its product. On July 17, 2008, MedComp filed the '324 patent. The '324 patent is directed to a vascular access port assembly with a "structural element embedded in the port assembly base that indicates, under

---

[1] Power injection technology is useful for intravenous delivery of highly viscous substances, such as contrast media used in a CT scan. Because of its viscosity, contrast media must be delivered at higher flowrates than other fluids to ensure it fully permeates the patient's bloodstream. Using power injection to inject contrast media results in a better CT scan image, enabling radiologists to more easily detect tumors.

X-ray examination, a pressure property of the port assembly, satisfying the FDA guidelines." ECF No. 930 (Def.'s Claim Construction") at 1-2. Bard claims that its patents are prior art to the '324 patent. And MedComp claims that the '324 patent is prior art to Bard's patents.

In 2012, C.R. Bard filed this suit against MedComp, as well as suits against other companies with similar technology, AngioDynamics and Smiths Medical. At the start of the lawsuit, C.R. Bard was the assignee of the patents-in-suit and thus had standing to bring the action. In 2017, C.R. Bard assigned legal title to the patents-in-suit to BPV, C.R. Bard's wholly owned subsidiary. BPV therefore became a successor-in-interest and gained statutory standing under 35 U.S.C. § 281. As a result, BPV joined this lawsuit as a co-plaintiff.

On July 22, 2021, Judge Shelby granted summary judgment to MedComp, holding that Plaintiffs' patents were ineligible under 35 U.S.C. § 101 because they were directed at an abstract idea. Although the parties briefed claim construction at that time, Judge Shelby did not construe the parties' claims.

On February 17, 2023, the Federal Circuit reversed Judge Shelby's order, holding that "Bard's three patents are directed to eligible subject matter under § 101." *C.R. Bard, Inc. v. Med. Components, Inc.*, 2023 WL 2064163, at *2 (Fed. Cir. Feb. 17, 2023). The Federal Circuit based its decision on its ruling in the Bard lawsuit against AngioDynamics. In that case, the Federal Circuit explained that the focus of Bard's claims

> is not solely on the content of the information conveyed, but also on the means by which that information is conveyed. In particular, the claimed invention is described in the patents as satisfying a specific need for easy vascular access during CT imaging, and it is the radiographic marker in the claimed invention that makes the claimed port particularly useful for that purpose because the marker allows the implanted device to be readily and reliably identified via x-ray, as used during CT imaging.

*CR Bard Inc. v. Angiodynamics, Inc.*, 979 F.3d 1372, 1384 (Fed. Cir. 2020).

In the same *Angiodynamics* litigation, the Federal Circuit also released a decision in 2018 regarding the construction of Bard's patents at issue in this instant lawsuit. Of note, the Federal Circuit reversed the Patent Trial and Appeal Board's ("PTAB" or "the Board") ruling that Bard's "claims merely require that the access port be labeled as power injectable." Rather, the Court construed the claims "to mean that the claimed access port *is* power injectable." *CR Bard Inc. v. Angiodynamics, Inc.*, 748 Fed. Appx. 1009, 1016 (Fed. Cir. 2018) (emphasis added).

Now, on remand from the Federal Circuit and after reassignment of this case to the undersigned, the parties have briefed claim construction and filed cross-motions for summary judgment. The court construes the claims below in accordance with Federal Circuit precedent and decides the motions for summary judgment.

## ANALYSIS

The parties dispute the proper construction for several of the terms found in the patents. The court first resolves these construction disputes. The court then turns to the parties' cross-motions for summary judgment. *See Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A claim must be construed before determining its validity just as it is first construed before deciding infringement." (citation omitted)).

## I.    CLAIM CONSTRUCTION

The parties propose ten terms for construction, six terms from Bard's patents and four terms from MedComp's '324 patent. The court begins with construction of Bard's patents' terms and then turns to the '324 patent's terms.

### A.    Legal Standard

The proper construction of words or phrases found in a patent claim is a question of law for the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 387 (1996). "[T]he words of a claim are generally given their ordinary and customary meaning," which is "the meaning that the

term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (citation omitted).

In determining the ordinary and customary meaning of a term, courts first look to intrinsic evidence, which includes "the patent claims and specifications, along with the patent's prosecution history." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Id.* Extrinsic evidence includes "expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317.

B.    *Bard's Patents-In-Suit*

As an initial matter, the parties disagree about the application of printed matter doctrine to all but one of Bard's proposed terms for construction. The court first addresses whether printed matter doctrine applies to Bard's terms. It then turns to construing the individual terms.

"Printed matter encompasses any information claimed for its communicative content." *Angiodynamics*, 979 F.3d at 1381. Defendant argues that five of six of Bard's proposed terms, "radiopaque identification feature," "radiopaque markings," "alphanumeric," "structural feature of the access port identifying the access port as being power injectable," and "power injectable"/"suitable for power injection," are printed matter not entitled to patentable weight.

The Federal Circuit has "long recognized that certain 'printed matter' falls outside the scope of patentable subject matter under U.S. patent law." *Id.* (quoting *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1064 (Fed. Cir. 2010)). Specifically, "the doctrine prohibits patenting such printed matter unless it is functionally related to its substrate, which encompasses the structural elements of the claimed invention." *Id.* (internal quotation marks omitted). In determining whether a functional relationship exists, courts must consider "whether the printed matter merely informs

people of the claimed information, or whether it instead interacts with the other elements of the claim to create a new functionality in a claimed device or to cause a specific action in a claimed process." *Id.*

In *Angiodynamics*, the Federal Circuit analyzed whether the printed matter doctrine applied to the patents at issue in this case. The Court distinguished between terms that relate to the content of information conveyed and terms that describe the means of conveying information, because the latter creates a new functionality in the claimed device. *Angiodynamics*, 979 F.3d at 1384. In this vein, the Federal Circuit explained,

> When each [Bard] claim is read as a whole, the focus of the claimed advance is not solely on the content of the information conveyed, but also on the means by which that information is conveyed. In particular, the claimed invention is described in the patents as satisfying a specific need for easy vascular access during CT imaging, and it is the radiographic marker in the claimed invention that makes the claimed port particularly useful for that purpose because the marker allows the implanted device to be readily and reliably identified via x-ray, as used during CT imaging.

*Id.* Thus, the Federal Circuit viewed the radiographic marker as a means of conveying information, entitling the term to patentable weight.

Similarly, the structural feature of the port also creates a new functionality in that it provides a means of conveying that the PowerPort MRI is power injectable. Because the port must be implanted beneath the skin, the structural feature allows a medical professional to determine whether the port is power injectable simply by palpation. Like the radiopaque identifier or markers, this feature allows the implanted device to be readily and reliably identified as power injectable. These terms describe the means of conveying information rather than the information itself.

Given the Federal Circuit's ruling, information conveying that the PowerPort MRI is suitable for power injection is not entitled to patentable weight, but the means of conveying that information, i.e. the radiopaque identifier or structural features of the port, are entitled to patentable

weight. Therefore, the printed matter doctrine does not apply to the terms "radiopaque identification feature," "radiopaque markings," and "structural feature of the access port identifying the access port as being power injectable," as those terms are directed to the means of conveying information.

But unlike the radiographic identification feature, radiographic markings, and structural feature of the PowerPort MRI, alphanumeric characters serve no functional purpose. In *Angiodynamics*, the Federal Circuit rejected Bard's argument that "mere identification of a device's own functionality is sufficient to constitute new functionality for purposes of the printed matter doctrine." *Id.* at 1382. Using alphanumeric characters does not allow a medical professional to identify the port in any new or innovative way. Thus, "alphanumeric" is printed matter not entitled to patentable weight.

Finally, Defendant also argues that "power injectable/suitable for power injection" is printed matter not entitled to patentable weight. Here, the Federal Circuit's 2018 opinion is particularly useful. In that order, the Federal Circuit reversed PTAB's decision that Bard's claims were "broad enough to encompass both power injectable and non-power injectable ports." *Angiodynamics, Inc.*, 748 Fed. Appx. at 1016. Instead, the Federal Circuit held, the claims must be construed "to mean that the claimed access port *is* power injectable." *Id.* And the Court emphasized that "[a]s the record evidence makes clear, power injecting a non-power injectable port can cause serious injury or death. Distinguishing between the two types of ports is the crux of what the patents claim." *Id.* Thus, the claim limitations require the port to *be* power injectable, not just *identify* the port as power injectable. Accordingly, the term, "power injectable," as interpreted by the Federal Circuit, does not represent mere identification of the access port's functionality, but rather the functionality of the port itself.

Further, after the Federal Circuit remanded the case to PTAB, the Board held that the Federal Circuit's claim interpretation was dispositive to its anticipation decision because "[e]ach of the rejections proposed by the Requester, and adopted by the Examiner, was premised on a claim interpretation that did not require the access port to have 'power injectable' capability." *Angiodynamics, Inc. v. C.R. Bard, Inc.*, 2019 WL 411125, at *2 (P.T.A.B. Jan. 28, 2019). The Board concluded that the record did not indicate that the prior art reference disclosed a power injectable access port. For this reason, PTAB reversed the Examiner's rejections of Bard's claim for anticipation.

An anticipation analysis requires a "court to compare the properly construed claims to the available prior art. If each and every limitation is found either expressly or inherently in a single prior art reference, then the claim is invalid under § 102 for anticipation." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1302 (Fed. Cir. 2011). In considering whether a patent's claims are anticipated by prior art, courts only consider the claims entitled to patentable weight. *See In re DiStefano*, 808 F.3d 845, 848 (Fed. Cir. 2015) (reversing a finding of anticipation based on a holding that PTAB erred in not giving a claim patentable weight under the printed matter doctrine). The dispositive factor in the Board's anticipation decision was the fact that the prior art was not power injectable. Thus, PTAB must have viewed the term, "power injectable," as not printed matter entitled to patentable weight.

And dicta from the Federal Circuit's 2020 *Angiodynamics* decision on printed matter demonstrates a similar viewpoint. There, in its anticipation analysis, the Court noted that "AngioDynamics presented largely undisputed evidence that certain prior art ports, and the use of those ports, satisfied most of the remaining elements of the asserted claims, including power injectability and the presence of external identifiers." *Angiodynamics*, 979 F.3d at 1384. The fact

that the Court considered power injectability in its anticipation analysis means that it must have given "power injectable" patentable weight. If it did not, whether the prior art satisfied a power injectable claim limitation would have been irrelevant.

Regardless of either decision, if Bard's claims are to be interpreted as disclosing a port that *is* power injectable, not that it simply communicates that the port is power injectable, then that presents a new functionality to the claimed device. And in Bard's patents, the power injectable capability of the ports provides functionality to the overall invention. Thus, to comply with the Federal Circuit's 2018 decision, the court must give "power injectable"/"suitable for power injection" patentable weight.

In sum, the terms "radiopaque identification feature," "radiopaque markings," "structural feature of the access port identifying the access port as being power injectable," and "power injectable"/"suitable for power injection," are not printed matter and thus entitled to patentable weight. The term, "alphanumeric," is printed matter not entitled to patentable weight.

Finally, Defendant proposes one construction for all the terms it argues are not entitled to patentable weight.[2] But one construction for all terms would not give them their ordinary meaning because they are distinct terms with separate meanings. Thus, Defendant's request falls largely out of line with the purpose of claim construction. The law requires precision on behalf of the patentee and construing multiple claims into one meaning would be anything but precise. *See* 35 U.S.C. §112 ("The specification shall conclude with one or more claims *particularly pointing out* and

---

[2] Defendant proposes construing the terms, "radiopaque identification feature," "radiopaque markings," "alphanumeric," "structural feature of the access port identifying the access port as being power injectable," and "power injectable"/"suitable for power injection," into one meaning: "An identifier, marker or structural feature that conveys, identifies or indicates to a medical practitioner that the port may be injected and pressurized by mechanical assistance (where pressurization by mechanical assistance does not include injection by hand, for example via a syringe including a needle)." Def.'s Claim Construction at 12.

*distinctly claiming* the subject matter which the inventor or a joint inventor regards as the invention.") (emphasis added). Further, Defendant's argument is based entirely on its misreading of the Federal Circuit opinion and the incorrect conclusion that the terms are printed matter. Combining these terms into one definition is not only unnecessary but risks inviting error. The court therefore construes the individual terms separately below.

        1)        "radiopaque identification feature" and "radiopaque markings"

First, the court construes the terms, "radiopaque identification feature" and "radiopaque markings." Defendant argues that "the term 'radiopaque' [must] be construed separately from the terms 'identification feature' and 'markings'" to avoid improperly joining printed matter and non-printed matter into a single term. Def.'s Claim Construction at 9.

But separating the adjective "radiopaque" from modifying the nouns "identification feature" and "markings" gives those terms an entirely new meaning. Bard specifically claimed, "a radiopaque identification feature" and a "radiopaque marking" not simply an "identification feature" or a "marking." Words must be given their ordinary and customary meaning. An *acoustic* identification feature is different from a *radiopaque* identification feature in the same way that an *alphanumeric* identification feature is different from a *radiopaque* identification feature. Adjectives matter.

And Defendant muddles its argument by attempting to replace the adjective "radiopaque" in its proposed construction with "alphanumeric." If Bard meant to specify an alphanumeric identification feature in its claim, it would have. But the terms must be construed together as they appear in the claim. And in Bard's claims, the adjective "radiopaque" modifies the nouns "identification feature" and "marking" in a way that significantly changes the meaning of the terms.

As to the ordinary meaning of those terms, "radiopaque" is especially instructive. Radiopaque means that the identification or marking is visible on radiographic imaging, such as an X-ray or CT scan. This interpretation aligns with the claim itself which goes on to specify that the radiopaque identification feature is "observable via imaging technology." 022 Patent at 62; *see also* 302 Patent at 45 ("[T]he assembly includes a radiopaque alphanumeric message observable through interaction with X-rays subsequent to subcutaneous implantation of the assembly."). Plaintiffs propose construing "radiopaque identification feature" as "a feature that is visible when viewed on an x-ray" and "radiopaque markings" as "markings that are visible when viewed on an x-ray." Plaintiffs' proposal aligns with the plain meaning of the terms and the court adopts their construction.

> 2)    "alphanumeric"

Next, the parties disagree as to whether "alphanumeric" describes characters with at least one number and one letter or characters with letters and/or numbers. Defendant proposes limiting the term to require at least one letter and at least one number. Defendant supports its argument with extrinsic evidence, dictionary definitions of the term. But to determine a term's ordinary meaning, that court must first look to intrinsic evidence, which includes "the patent claims and specifications, along with the patent's prosecution history." *Teva Pharms*, 574 U.S. at 331. The court begins there.

Plaintiffs argue that Defendant's construction "is flatly inconsistent with the intrinsic evidence." Pls.' Claim Construction at 12. The court agrees. Under Defendant's proposal for claim construction, the character used in the radiopaque identifier on the PowerPort MRI, "CT," would not qualify. But the specification of the 302 patent states, "the housing including radiopaque markings including the alphanumeric message 'CT.'" 302 Patent at 45. Further, an example embodiment contemplated in the '022 patent is "the identification feature can be one or more

alphanumeric characters, such as the 'CT' depicted." 022 Patent at 60. Therefore, in the context of the entire patent, Defendant's proposed construction would be nonsensical. Accordingly, the court adopts Plaintiffs' proposed construction for "alphanumeric," as "characters including a letter and/or a number."

      3)    "structural feature of the access port identifying the access port as being power injectable"

Here, the parties propose different terms for construction. Essentially, Defendant requests additional verbiage from Bard's claim be added at the end of the term for construction: "the at least one structural feature comprising at least one concave side surface in a second side surface different from the first side surface, the concave side surface extending to the bottom perimeter concave portion identifying the access port as being power injectable." But Defendant provides no explanation as to why it requests additional verbiage for claim construction. Therefore, the court will construe the portion of the term that both parties agree upon, "structural feature of the access port identifying the access port as being power injectable."[3]

Defendant then proposes two different constructions for this term, one in its opening claim construction brief and one in its responsive brief. But these proposals either add or limit meaning of the term. For example, it proposes "[t]he shape of the access port including at least one concave side surface." Defendant provides no argument as to why the court would limit "structural feature" to mean "shape," and the court sees no obvious reason to do so. It also proposes one construction to define this term as well as the terms "radiopaque identification feature" and "radiopaque markings." Again, Defendant provides no explanation as to why these terms should all be limited to one definition.

---

[3] The court also notes that it is already construing a portion of Defendant's additional proposed verbiage, "extending to the bottom perimeter" as another term below.

On the other hand, Plaintiffs' proposed construction is nearly identical to the term itself and aligns with the term's ordinary meaning. The court thus adopts Plaintiffs' construction, "structural feature of the access port identifying that the claimed access port is power injectable," for the term, "structural feature of the access port identifying the access port as being power injectable."

4)    "power injectable"/"suitable for power injection"

The parties then ask the court to construe the term, "power injectable/suitable for power injection." Plaintiffs suggest adopting a construction adopted by Judge Nielson in a related case currently pending in this district, "[a] port that can be injected and pressurized by mechanical assistance (where pressurization by mechanical assistance does not include injection by hand, for example via a syringe including a needle)." *C.R. Bard, Inc. v. Medical Components, Inc.*, 2020 WL 6902367, at *10 (D. Utah 2020). Judge Nielson added the parenthetical at the end of the term construction because the specification of the claims in that case "distinguishe[d] between injection and pressurization by mechanical assistance and injection by hand, including via a syringe including a needle." *Id.* at *12. The claims at issue here do the same. *See, e.g.*, 022 Patent at 56 ("The access port may be injected by hand (e.g., via a syringe including a needle) for example, or may be injected and pressurized by mechanical assistance (e.g., a so-called power injectable port).").

But Defendant argues that the court should adopt a slightly different construction, replacing Plaintiffs' proposed wording, "a port that can be injected," with the phrase, "an identifier indicates that the port *may* be injected." But this construction would run afoul of the Federal Circuit's ruling when it reversed PTAB's decision that Bard's "claims merely require that the access port be labeled as power injectable." *See Angiodynamics, Inc.*, 748 Fed. Appx. at 1016. There, the Court

construed the same patents at issue in this case "to mean that the claimed access port *is* power injectable." *Id.* And this court must do the same.

Plaintiffs' proposed construction aligns with the Federal Circuit ruling. But Judge Nielson interpreted a slightly different term, "power injectable access port," which includes the noun, "port." Because the proposed term for construction is an adjective, not a noun, the court adopts the construction, "capable of being injected and pressurized by mechanical assistance (where pressurization by mechanical assistance does not include injection by hand, for example via a syringe including a needle)."

5)    "extending to the bottom perimeter"

Finally, the court turns to the last term in Bard's patents proposed for construction. Here, Plaintiffs argue that the court should adopt the plain and ordinary meaning of "extending to the bottom perimeter." But Defendant argues that Plaintiffs' proposal ignores the prosecution history. Instead, it seeks to limit the claim by adding that "the concave side surface extends to, *but not through*, the outer edge of the bottom surface of the port, *forming a peripheral discontinuity* between the side surface and the bottom perimeter." Def.'s Claim Construction at 17 (emphasis added).

"[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. During prosecution, Bard amended the language of claim 8 of the '615 patent from "through the bottom surface" to "to the bottom perimeter" to overcome a rejection for indefiniteness. Prior to amendment, the Examiner noted that "[i]t is unclear what the Applicant is claiming by describing a concave surface that extends 'through' the bottom surface." ECF No. 457-4 at 194. And this makes sense because a concave surface that extends through a bottom

14

surface would be impossible as a matter of geometry. The Examiner also interpreted "'bottom perimeter' to be the edge around the port that is generally near the bottom of the port," as opposed to the bottom surface which is the bottom plane of the port. *Id.* Thus, Bard amended its claim to "to the bottom perimeter" to demonstrate that the concave side surface extends to the bottom perimeter, an area that encompasses the edge around the port that is generally near the bottom of the port, but not beyond the bottom surface, or bottom plane of the access port. And the Examiner allowed that claim because "the prior art of record fails to disclose either singly or in combination the claimed device and method of identifying an implanted access port that has concave sides, including the interface between the side and the base being concave." *Id.* at 230.

MedComp requests the court construe claim 8 to mean "to, but not through, the bottom perimeter." But this changes the meaning of the term in a way that contradicts the prosecution history. Bard limited its claim from a concave side surface that extends beyond the bottom *surface*. It did not amend its claim to limit the concave side surface from extending through the bottom *perimeter*. As demonstrated by the Examiner's interpretation of the claim during its prosecution history, surface and perimeter have two separate meanings. The bottom perimeter encompasses more than just the bottom surface of the port. Thus, the concave side surface may not only extend to the bottom perimeter, but it may also extend through the bottom perimeter to the bottom surface.

There is also no evidence that Bard limited claim 8 to require "a peripheral discontinuity." During prosecution, Bard sought claims that required a peripheral discontinuity, i.e. a "lip feature" and a "an overhanging rim feature." *Id.* at 30. But Bard also sought claims that did not require a peripheral discontinuity. *Id.* at 30-33. In fact, claim 13, which ultimately issued as claim 8, did not require such a feature. And because Bard ultimately canceled the claims that sought the "peripheral discontinuity" distinction, it is unclear how that requirement developed any claim at issue here.

15

Finally, none of the figures that accompany the '615 patent specify any peripheral discontinuity. Thus, the court declines to adopt Defendant's proposed language requiring a "peripheral discontinuity."

The prosecution history does not support limiting Bard's claim as Defendant proposes. Accordingly, the court adopts the plain and ordinary meaning of "extending to the bottom perimeter."

C.    *MedComp's '324 Patent*

Next, the parties request construction of four terms in the '324 patent. The court construes these terms below.

1)    "embedded in the bottom wall"

During oral argument, the parties indicated that they would be willing to stipulate to the construction of this term. Thereafter, the parties filed a joint stipulation in which they agreed that the term, "embedded in the bottom wall," shall be construed to mean: "at least partially incorporated in the bottom wall of the housing base." ECF No. 941. Accordingly, the court adopts this construction.

2)    "a pressure property of the port assembly"

Plaintiffs next argue that "pressure property" is indefinite under 35 U.S.C. §112. Indeed, "a patent must describe the exact scope of an invention . . . to apprise the public of what is still open to them." *Markman*, 517 U.S. at 373. "Section 112 . . . entails a delicate balance. On the one hand, the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty . . . is the price of ensuring the appropriate incentives for innovation." *Id.* at 909.

Section 112 states that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint

16

inventor regards as the invention." 35 U.S.C. §112. And "the United States Supreme Court reads [this statute] to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "[I]f the court concludes that a person of ordinary skill in the art, with the aid of the specification, would understand what is claimed, the claim is not indefinite." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1381 (Fed. Cir. 2015).

To demonstrate the term, "pressure property," is definite, Defendant points to a part of the '324 patent's summary which reads,

> One such key attribute in particular would be for example that the venous access port is rated to be used for power injection such as of contrast fluid, wherein for example the letters "CT" (for "computed tomography", or "contrast enhanced computed tomography") would be provided that are of radiopaque material, or are cutouts through radiopaque material. The attribute in this example is the property of the port's being adapted to withstand high pressures that are used for injection of contrast fluid into a patient, and the letters "CT" would be understood in medical practice to indicate that the port is suitable for the high pressure injection of contrast fluid.

'324 patent at 11. In the background summary, the '324 patent gives an example of a pressure property: "the property of the port's being adapted to withstand high pressures that are used for injection of contrast fluid into a patient." *Id.* Thus, the "indicia . . . that visually indicate a pressure property of the port assembly" refers to indicia that visually communicates the port is adapted to withstand high pressures associated with injection of contrast fluid. Therefore, a person skilled in the art would conclude that the term, "pressure property," refers to an attribute of the port discussed in the patent – that the port is "adapted to withstand high pressure associated with injection of contrast fluid." Accordingly, the term "pressure property" is sufficiently definite because "a person

of ordinary skill in the art, with the aid of the specification, would understand what is claimed" in the '324 patent. *Nautilus*, 783 F.3d at 1381.

But the term "pressure property" is ambiguous and can only be construed by looking to the patent's specification. Thus, the plain and ordinary meaning of the term is not the proper construction. Rather, the court construes the term to mean "an ability to withstand high pressure associated with injection of contrast fluid," in accordance with the '324 patent's specification.

        3)      "cap securing the needle-penetrable septum to the housing"

For this term, Plaintiffs propose the construction, "[a] component separate from the housing that attaches the septum to the housing." But Defendant argues that this construction "invites the court to improperly read a limitation (*i.e.*, "separate from the housing") into the claim." ECF No. 910 ("Def.'s Resp.") at 21. The court agrees.

Contrary to what Plaintiffs argue, a "cap" that attaches two objects together is not necessarily separate from both objects. Indeed, the cap could be attached to one of the objects permanently, just as buttonholes are attached to a shirt to secure cufflinks. Buttonholes are not separate from the shirt simply because they attach the cufflinks to the shirt. When referring to the term, shirt, the ordinary meaning of that term is the shirt and all its components, including the buttonholes. Thus, requiring the cap to be separate from the housing is an unwarranted limitation.

On the other hand, Defendant proposes changing the word, "housing," to "housing base." But this would impact the meaning of the term. Defendant provides no explanation for why the court should construe housing to mean housing base. Instead, the court will construe the term, "cap securing the needle-penetrable septum to the housing," in accordance with its ordinary meaning: a component that attaches the septum to the housing.

        4)      "wherein the one or more alphabetical letters comprise the letters 'CT'"

Plaintiffs argue that this term is printed matter not entitled to patentable weight. The court agrees. As noted above, printed matter doctrine distinguishes between terms that relate to the content of information conveyed and terms that describe the means of conveying information, because the latter creates a new functionality in the claimed device. *Angiodynamics*, 979 F.3d at 1384. The letters, "CT," relate to the content of information conveyed, just as Bard's patent's term, "alphabetical," does. The letters do not create a new functionality as Bard's radiopaque indicators do. Therefore, this term is printed matter not entitled to patentable weight.

\*        \*        \*

The court finds that "alphanumeric" and "wherein the one or more alphabetical letters comprise the letters 'CT'" are printed matter not entitled to patentable weight. The court also finds that printed matter doctrine does not apply to the terms "radiopaque identification feature," "radiopaque markings," "structural feature of the access port identifying the access port as being power injectable," and "power injectable/suitable for power injection," as those terms are directed to the means of conveying information.

In summary, the court construes the claims as follows:

| TERM | THE COURT'S CONSTRUCTION |
|---|---|
| **BARD'S PATENTS** | |
| radiopaque identification feature | a feature that is visible when viewed on an x-ray |
| radiopaque markings | markings that are visible when viewed on an x-ray |
| alphanumeric | characters including a letter and/or a number |
| structural feature of the access port identifying the access port as being power injectable | structural feature of the access port identifying that the claimed access port is power injectable |

| power injectable/suitable for power injection | capable of being injected and pressurized by mechanical assistance (where pressurization by mechanical assistance does not include injection by hand, for example via a syringe including a needle) |
|---|---|
| extending to the bottom perimeter | plain and ordinary meaning |
| **MEDCOMP'S PATENT** | |
| embedded in the bottom wall | at least partially incorporated in the bottom wall of the housing base |
| a pressure property of the port assembly | an ability to withstand high pressure associated with injection of contrast fluid |
| cap securing the needle-penetrable septum | a component that attaches the septum to the housing |
| wherein the one or more alphabetical letters comprise the letters "CT" | no construction |

## II.    CROSS MOTIONS FOR SUMMARY JUDGMENT

Both parties move for summary judgment. Plaintiffs move for summary judgment on Defendant's counterclaim, arguing that the '324 patent is invalid. Defendant moves for summary judgment on Plaintiffs' claims, arguing that there is no dispute of fact that MedComp has not infringed on Plaintiffs' patents. It also moves for summary judgment on its counterclaim, arguing that there is no dispute of fact that Bard infringed on the '324 patent.

### A.  Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co*., 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

When a court is presented with cross-motions for summary judgment, it must take each motion separately, viewing the facts in the light most favorable to one party and then viewing the facts in the light most favorable to the opposing party. *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019).

## B.  *Plaintiffs' Motion*

Plaintiffs move for summary judgment on Defendant's counterclaim, arguing that the asserted claims of the '324 patent are invalid because they are anticipated by Bard's product, the PowerPort MRI. A patent is presumed to be valid unless its invalidity is proven by clear and convincing evidence. *Bristol-Myers Squibb co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1374 (Fed. Cir. 2001).  Under 35 U.S.C. § 102, a patent is invalid if it is anticipated by prior art. "[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol-Myers*, 246 F.3d at 1374.

21

Prior art is defined in 35 U.S.C. § 102, which was amended by the America Invents Act ("AIA") in 2012. Because MedComp's patent was filed prior to that statute, those amendments do not apply and therefore the court references the pre-AIA statute. That statute provides that a patent is invalid if "the [claimed] invention was made in this country by *another inventor* who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g) (2002) (emphasis added). "Under § 102(g), [a party] can establish that its [invention] was prior art by proving either that it reduced its invention to practice first *or* that it conceived of the invention first and was diligent in reducing it to practice." *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 974-75 (Fed. Cir. 2014) (emphasis added) (internal quotation marks omitted) (referencing the pre-AIA statute).

Plaintiffs argue that Bard reduced its invention to practice earlier than MedComp as evidenced by its 510(k) application submitted on November 6, 2006. Defendant argues that Plaintiffs cannot rely on the 510(k) application as evidence of reduction to practice. It also argues that MedComp reduced its invention to practice when it filed a different provisional patent application on October 18, 2006, to which the '324 patent claims priority. The court first addresses whether Plaintiffs may rely on the 510(k) application as evidence that Bard reduced the PowerPort MRI to practice. It then decides whether the '324 patent can claim priority to the '591 provisional application.

### 1) Bard's 510(k) Application

As an initial matter, Defendant faults Plaintiffs for failing to allege a date of conception, instead relying entirely on Bard's 510(k) application to demonstrate Bard reduced its invention to practice. But Plaintiffs need not allege a date of conception if they can prove reduction to practice. *See Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012) ("An alleged prior inventor would need to prove conception only if the alleged prior inventor had not successfully reduced the invention to practice before the critical date of the patent-at-issue."); *see also Tyco*, 774 F.3d at

974-75 ("Under § 102(g), [a party] can establish that its [invention] was prior art by proving either that it reduced its invention to practice first *or* that it conceived of the invention first and was diligent in reducing it to practice." (emphasis added)).

To establish reduction to practice, Plaintiffs "must have (1) constructed an embodiment or performed a process that met all the claim limitations and (2) determined that the invention would work for its intended purpose." *Teva Pharm. Indus. v. Astrazeneca Pharms. LP*, 661 F.3d 1378, 1383 (Fed. Cir. 2011). Bard's 510(k) application includes pictures of samples of the PowerPort MRI that Bard constructed as well as the testing results of those samples for clinical use in humans. Thus, Bard not only constructed the embodiment that met all its claim limitations by creating the samples, it also determined that those samples would work for their intended purpose as evidenced by its test results.

Defendant does not dispute these facts. Rather, it argues that Bard's 510(k) application is not evidence of its reduction to practice because (1) Bard never identified an inventor and (2) the application does not describe prior art embodying the asserted claims in the '324 patent. The court addresses each argument below.

a) Identification of an inventive entity

Defendant argues that the 510(k) application cannot be evidence of a reduction to practice because Bard failed to properly identify an inventive entity, connect that entity to the 510(k) application, or establish that the 510(k) application was publicly available. Defendant references Section 102(g) which states that a patent is invalid if "the [claimed] invention was made in this country by *another inventor* who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g) (2002) (emphasis added). Defendant argues that Bard does not constitute "another inventor" as defined in Section 102(g).

First, Defendant argues that "another inventor" must be an individual person and therefore Plaintiffs cannot claim that Bard is an inventor because it is a corporation. But Defendant provides no legal authority for such a requirement, and certainly the plain language of the statute offers nothing to suggest as much. In fact, the Federal Circuit has repeatedly found that a corporation constitutes a prior inventor under Section 102(g). *See, e.g., Tyco*, 774 F.3d at 975 (finding that the defendant, a corporation, reduced its invention to practice prior to the plaintiff's conception date); *see also Fox Group, Inc. v. Cree, Inc.*, 700 F.3d 1300, 1305 (Fed. Cir. 2012) (finding that the defendant, a corporation, was a "another inventor" under 35 U.S.C. § 102(g)). Thus, there is no restriction under Section 102(g) that "another inventor" must be an individual.

Defendant also argues that Plaintiffs have not shown that Bard conceived of the PowerPort MRI or that Bard contemporaneously appreciated the product. But Plaintiffs do not have to show conception if the product has been successfully reduced to practice. And this is exactly what the 510(k) application demonstrates—a reduction to practice of the PowerPort MRI.

In arguing that conception is required, Defendant misstates the holding of *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F. 3d 1367 (Fed. Cir. 2010). Unlike the case before the court, in *Solvay*, there was no evidence that the defendant, Honeywell, had reduced the claimed invention to practice. Therefore, the issue before the Federal Circuit was whether Honeywell conceived of the invention not whether Honeywell must demonstrate conception if it has successfully proven reduction to practice. And the Federal Circuit in that case reaffirmed that prior art can be demonstrated by showing reduction to practice *or* conception with reasonable diligence to reduce an invention to practice. *See id.* at 1376.

Finally, Defendant argues that Plaintiffs' 510(k) application cannot be used to demonstrate reduction to practice because it was not publicly available. In the case cited by Defendant, the

24

court held that a non-public 510(k) application cannot establish that the party's invention was known in the United States to anticipate the other party's patents. But Plaintiffs do not seek to use the 510(k) application to demonstrate the PowerPort MRI was known in the United States to anticipate the '324 patent. That is the requirement under Section 102(a). Rather, Plaintiffs seek to use the 510(k) application to demonstrate the PowerPort MRI was reduced to practice, the requirement under Section 102(g). Either subsection may be used to show a party's invention is prior art under Section 102. 35 U.S.C. § 102 (ending each subsection with "or" rather than "and"). Accordingly, Bard properly identified "another inventor" under 35 U.S.C. § 102(g).

b) Prior art embodying the asserted claims in the '324 patent

Defendant next argues that the 510(k) application cannot be evidence of prior art because it does not disclose every limitation of the '324 patent. But the issue is not whether the '324 patent is anticipated by the 510(k) application. The issue is whether the '324 patent is anticipated by the PowerPort MRI. The 510(k) application is merely evidence that the PowerPort MRI was reduced to practice.

"[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Bristol-Myers*, 246 F.3d at 1374. For the PowerPort MRI to be prior art to the '324 patent, it would have to meet every limitation of the claims in the '324 patent to invalidate it. And Defendant admits that it does just that in its final infringement contentions supporting its counterclaim. ECF No. 462-28 ("Def.'s Infringement Contentions"). Indeed, MedComp's entire counterclaim relies on the overlapping claim limitations between the PowerPort MRI and the '324 patent. Still, Defendant argues that the PowerPort MRI does not meet the claim limitations for "pressure property" or "embedded in the bottom wall." The court strongly disagrees.

First, the PowerPort MRI meets the limitation for "pressure property," which the court construed to mean, "an ability to withstand high pressure associated with injection of contrast fluid." Defendant admitted that the PowerPort MRI meets the limitation for "pressure property" in its final infringement contentions. There, Defendant alleged that the PowerPort MRI infringes on the '324 patent as evidenced in part by "[t]he specifications table of POWERPORT MRI Implantable Port shows that 'CT' indicates a *pressure property* of the port." *Id.* at 16 (emphasis added). MedComp also provided a diagram that includes an arrow pointing from "pressure property" to "300 psi max," under the indicator "CT" in the PowerPort MRI specification table.

Despite admitting that the letters "CT" identify a pressure property of the PowerPort MRI, Defendant argues that "Bard provided no evidence indicating that, as of the November 6, 2006 date of its 510(k) pre-market submission, the letters 'CT' were used (or otherwise known) to indicate 'a pressure property of the port assembly' as required by claims 1 and 19 of the '324 patent." ECF No. 907 ("Def.'s Resp.") at 23-24. But in the marketing material Bard submitted with its 510(k) application, Bard instructs its customers that those letters are used to indicate the PowerPort MRI is power injectable. And, in reviewing the final infringement claims, MedComp undoubtedly knew this.

Further, the PowerPort MRI itself is adapted to withstand high pressure associated with injection of contrast fluid. The physical product thus meets the claim limitation, "pressure property." And the Federal Circuit confirmed that the patent claims covering the PowerPort MRI must be construed to "to mean that the claimed access port is power injectable," not that the markers merely indicate that the PowerPort MRI is suitable for power injection. *Angiodynamics*, 748 Fed. Appx. at 1016. Thus, there is no dispute that the PowerPort MRI meets the '324 patents' claim limitation for "pressure property."

Second, the PowerPort MRI meets the claim limitation for "embedded in the bottom wall." Defendant also admitted that it does so in its final infringement contentions, noting that the PowerPort's "[x]ray discernable indica are embedded in the bottom wall of the housing base." Def.'s Infringement Contentions at 21. In the same final infringement contentions, Defendant provides a convenient diagram to indicate that radiopaque markings are embedded in the bottom wall of the PowerPort MRI. *Id.* at 22. And indeed, Bard's patents themselves include figures clearly indicating that the radiopaque identification, "CT," is embedded in the bottom wall of Bard's vascular access ports.

As the Federal Circuit has emphasized, "[a] patent may not, like a nose of wax, be twisted one way to avoid anticipation and another to find infringement." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). This is especially problematic here because Defendant's claim for infringement relies on the '324 patent not being anticipated by the PowerPort MRI. And if the court adopted Defendant's arguments, that the PowerPort MRI does not meet the claim limitation for "pressure property" or "embedded in the bottom wall," then there would be no counterclaim for infringement.

Further, Defendant freely admitted and provided evidence that the PowerPort MRI meets the claim limitations for the '324 patent in its final infringement contentions. These statements were clear, deliberate, and unambiguous. Thus, the statements made in Defendant's final infringement contentions are judicial admissions. *See Centillion Data Sys. v. Qwest Communs. Int'l, Inc.*, 547 Fed. Appx. 980, 985 (Fed. Cir. 2013). And these admissions resolve any factual dispute that the PowerPort MRI meets all the claim limitations of the '324 patent.

Accordingly, the 501(k) application is evidence that Bard reduced the PowerPort MRI to practice on November 6, 2006, and the PowerPort MRI encompasses all the claim limitations of the '324 patent.

        2)       '591 Provisional Application

Defendant next argues that it constructively reduced its invention to practice before Bard reduced the PowerPort MRI to practice by filing the '591 provisional application. Here, Defendant seeks to claim the priority date of the '591 provisional application. "To antedate (or establish priority) of an invention, a party must show either an earlier reduction to practice, or an earlier conception followed by a diligent reduction to practice." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001). "A reduction to practice can be either a constructive reduction to practice, which occurs when a patent application is filed, or an actual reduction to practice." *Cooper v. Goldfarb*, 154 F.3d 1321 (Fed. Cir. 1998). Defendant filed the '591 provisional application on October 16, 2006, almost a month prior to Bard's filing of the 510(k) application. Defendant argues that this demonstrates that the '324 patent was constructively reduced to practice on October 16, 2006.

But for the '324 patent to have the same effective date as the '591 provisional application, the '324 patent must claim priority to the '591 provisional application. Defendant argues that the '324 patent need not claim priority to the '591 provisional application. It only needs to establish that the '591 provisional application constructively reduced the invention in the '324 patent to practice. Thus, Defendant argues, it need not follow the priority rules under 35 U.S.C. § 119. The court disagrees. Defendant must do both.

In *Stevens v. Tamai*, the Federal Circuit held that no further evidence is necessary to prove invention as of an earlier filing date if "a party is *entitled to rely on an earlier filed application and* the specification of that application shows a constructive reduction to practice of the count."

366 F.3d 1325, 1331 (Fed. Cir. 2004) (emphasis). Thus, for a party to establish an earlier filing date of its patent application, as Defendant attempts to do here, the party must demonstrate not only that the specification of its earlier application shows a constructive reduction to practice, but that it is entitled to rely on that earlier filed application. A party demonstrates this entitlement through the process of claiming priority. *Id.* ("To establish priority, parties may rely on earlier filed applications because conception and constructive reduction to practice of the subject matter described in an application occur when the application is filed.").

Thus, Defendant must not only establish that its specification of the '591 provisional application shows a constructive reduction to practice. It must also demonstrate that the '324 patent is entitled to rely on the '591 provisional application, which requires establishing priority under 35 U.S.C. § 119. *See id.*

"For a patent to claim priority from the filing date of its provisional application, it must satisfy 35 U.S.C. § 119 . . . ." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015). Section 119 provides "[a]n application for patent . . . shall have the same effect . . . as though filed on the date of the provisional application . . . if the application . . . is filed not later than 12 months after the date on which the provisional application was filed and if it contains or is amended to contain a specific reference to the provisional application." 35 U.S.C. § 119(e). Thus, the '324 patent shall have the same effect, that effect being constructive reduction to practice, as the '591 provisional application if the '324 application was filed within 12 months of the provisional application and contains a specific reference to the provisional application.

There is no dispute that Defendant filed the '324 patent more than 12 months after the filing of the '591 provisional application. There is also no dispute that the '324 patent contains no specific reference to the '591 provisional application. In fact, the '324 patent references a different

provisional application. *See* '324 Patent at (60). Accordingly, Defendant has not established that the '324 patent is entitled to rely on, or claim priority to, the '591 provisional application.

Defendant then argues that none of the legal authority cited by the court above applies because those cases concerned interference proceedings not district court proceedings. The court disagrees. The rules for establishing priority do not differ based on whether the dispute is in district court or before PTAB. To clarify, the term, priority, refers to both interference proceedings and the preservation of an effective filing date. *See In re Hilmer*, 57 C.C.P.A. 985, 990-91 (1970). Further, the Federal Circuit has applied the requirements for establishing priority under 35 U.S.C. § 119 to an appeal of a district court decision. *E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions, L.L.C.*, 525 F.3d 1353 (Fed. Cir. 2008). The court sees no reason why the same rules would not apply here. Further, the issue in *E.I. du Pont* in which the Federal Circuit applied 35 U.S.C. § 119 was whether a nonprovisional application was entitled to claim priority to a provisional application. This is *exactly* what Defendant is attempting to do here.

More importantly, Defendant provides no legal authority for the proposition that Section 119 requirements only apply to interference proceedings. And the plain language of Section 119 does not limit itself to interference proceedings. Rather, Defendant cites multiple cases that hold, "constructive reduction to practice occurs when a patent application on the claimed invention is filed." Def.'s Opp. at 10. But none of these cases involve provisional applications. Of course, the filing of the '324 patent establishes constructive reduction to practice of that claimed invention. The problem is that Defendant has not properly connected the '324 application to the '591 provisional application. And connecting the claims in both applications is not enough. *See Tamai*, 366 F.3d at 1331 (holding that a party may prove an earlier filing date if "a party is *entitled to rely on an earlier filed application and* the specification of that application shows a constructive

reduction to practice of the count." (emphasis added)). Therefore, Defendant must follow priority rules under Section 119.

Finally, Defendant's argument is completely nonsensical. If the court were to follow this logic, a party would be able to claim priority in a dispute before a district court but not in the same dispute before PTAB. This would inevitably encourage forum shopping and inconsistent, even opposite, results. Accordingly, the court is not persuaded by Defendant's argument. Defendant must follow 35 U.S.C. § 119 to establish an earlier priority date of the '324 patent.

Defendant also argues that "the '591 Provisional as filed clearly describes all the features required by the asserted claims of the '324 Patent and therefore represents a reduction to practice of those claims as of October 18, 2006." Def.'s Opp." at 15. But as discussed above, Defendant must do more than show the asserted claims overlap. Defendant must also follow the requirements outlined in Section 119. And Defendant again provides no case law or statute that would excuse it from complying with that statute. Defendant next argues that "the '591 Provisional was not abandoned, suppressed or concealed." *Id.* This is also irrelevant. A provisional application is abandoned as a matter of law if a request to convert the provisional application into a nonprovisional application has not been made within 12 months. *See* 35 U.S.C. § 111 ("Subject to section 119(e)(3), if no such request [to treat a provisional as an application filed under [35 U.S.C. § 111(a)], the provisional application shall be regarded as abandoned 12 months after the filing date of such application and shall not be subject to revival after such 12-month period.").

Therefore, MedComp cannot claim a priority date pursuant to the '591 provisional application because it failed to comply with 35 U.S.C. § 119.

*    *    *

The asserted claims of the '324 patent are invalid because they are anticipated by Bard's PowerPort MRI. There is no dispute of fact that Bard reduced the PowerPort MRI to practice when it filed the 510(k) application on November 6, 2006. And, as a matter of law, the '324 patent cannot claim priority to the '591 provisional application. Therefore, Defendant has failed to establish any facts demonstrating that it reduced its invention to practice before November 6, 2006. Accordingly, the court GRANTS Plaintiffs' motion for summary judgment and DISMISSES Defendant's counterclaim for infringement.

### C. Defendant's Motion

Next, Defendant moves for summary judgment on Plaintiffs' infringement claims. A party infringes if it "without authority makes uses, offers to sell, or sells any patented invention . . . ." 35 U.S.C. § 271. "Determining infringement requires two steps. First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly con-strued must be compared to the accused device or process." *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1120 (Fed. Cir. 2011) (internal quotation marks omitted). The court has construed all the relevant terms in Bard's patents in suit. Therefore, the next step to determine infringement is to compare Bard's patent claims to MedComp's products.

#### 1)  Plaintiffs' Claims for Infringement

Defendant argues that it is entitled to summary judgment on all of Plaintiffs' claims if the court adopts its claim construction or finds that Bard's patents are anticipated by U.S. Patent No. 6,287,293 ("Jones"). The court addresses each argument below.

##### a)  Adoption of Defendant's Claim Construction Proposals

Defendant argues that it should be granted summary judgment if the court adopts its claim construction proposals for "alphanumeric," "extending to the bottom perimeter," and "an identifier." Defendant also argues that the court should grant summary judgment on some of

Plaintiffs' claims because there is no evidence that a person skilled in the art would have understood the marking, "CT," to mean that the port is power injectable.

First, the court did not adopt Defendant's proposal that "alphanumeric" be construed to require at least one letter and one number. It also did not adopt Defendant's proposal for "extending to the bottom perimeter." Accordingly, the court declines to grant summary judgment on those grounds.

Defendant next argues that the term, "an identifier," should be construed as its ordinary meaning, which would require the words, "power injectable" or "suitable for power injection" to appear on the port itself. But the parties did not propose this term as one of the terms for construction in their claim construction briefs. And Defendant provides no reasoning or argument as to why the term should be construed in this way. Although Defendant claims it addressed this issue in its claim construction brief, it provides no citation. Regardless, Defendant's proposed construction is unconvincing. For "an identifier" to "identify[] the access port as being power injectable," that identifier need not literally have the words "power injectable." As Bard has previously mentioned, its PowerPort MRI identifies that its port is suitable for power injection with the radiopaque letters, "CT," and structural features. Accordingly, the court declines to adopt Defendant's construction of the term, "an identifier."

Finally, Defendant moves for summary judgment on claims 1-10 of the '302 patent and claims 1-3, 5, 8-9, 12 and 14 of the '022 patent. It argues that its products cannot infringe on these claims because there is no evidence that a person skilled in the art would have understood the marking "CT" to indicate a port is power injectable or suitable for power injection at the time the '302 patent was filed. Plaintiffs respond that this argument is irrelevant to infringement. Rather,

the analysis of infringement requires comparing the accused product with the claims as construed by the court. The court agrees.

Instead, Defendant attempts to make an argument about claim construction and the meaning that the term, "CT," would have to a person skilled in the art. But "CT" is not one of the terms the parties proposed for claim construction. Therefore, the briefing is wholly inadequate to determine how "CT" must be construed. Accordingly, the court declines to construe this term at this time.

b)  Anticipation by Jones

Defendant next argues that US Patent No. 6,287,293 ("Jones") anticipates Bard's patents. To show anticipation, Defendant "must prove by clear and convincing evidence that [Jones] discloses, either expressly or inherently, every limitation as asserted in the claims." *Crown Packaging Tech., Inc. v. Ball Metal Bev. Container Corp.*, 635 F.3d 1373, 1383 (Fed. Cir. 2011).

Defendant argues that Jones anticipates all claims in Bard's patents that are entitled to patentable weight. But Defendant misses one distinction. The invention in Jones is not power injectable. The Federal Circuit held that these claims must be interpreted "to mean that the claimed access port *is* power injectable" not that it merely indicates the port is power injectable. *Angiodynamics*, 748 Fed. Appx. at 1016 (emphasis added). And based on this holding, PTAB reversed anticipation findings on prior art that did not disclose a power injectable port. As discussed above, based on the Federal Circuit's ruling, "power injectable" is entitled to patentable weight because it describes a new functionality in the claimed device. And Jones does not disclose a power injectable port. Accordingly, Defendant has not proven by clear and convincing evidence that Bard's patents are anticipated by Jones.

*      *      *

34

The court declines to adopt MedComp's claim construction that would entitle it to summary judgment and finds that Jones does not anticipate Bard's patents. Accordingly, the court DENIES Defendant summary judgment on Plaintiffs' claims for infringement.

2)    Defendant's Counterclaim for Infringement

Defendant also moves for summary judgment on its counterclaim for infringement of the '324 patent. The court has determined that the '324 patent is invalid because it is anticipated by the PowerPort MRI and has granted Plaintiffs' motion for summary judgment on the invalidity of the '324 patent. Accordingly, the court DENIES summary judgment on Defendants' counterclaim for infringement.

**CONCLUSION AND ORDER**

In resolving the claim construction disputes, the court GRANTS the parties' Joint Motion to Determine Markman Issues and construes the claims as indicated in this decision. ECF No. 909. For the foregoing reasons, the court hereby GRANTS Plaintiffs' Motion for Summary Judgment and DISMISSES Defendant's counterclaim for infringement. ECF No. 892. The court also DENIES Defendant's Motion for Summary Judgment. ECF No. 896.

Signed August 26, 2025

BY THE COURT

Jill N. Parrish
United States District Court Judge